961 F.2d 211
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Phyllis Daniels GOODMAN; Lee R. Goodman, Plaintiffs-Appellants,
v.
LANDS END HOMEOWNERS ASSOCIATION OF HILTON HEAD,
INCORPORATED; George H. Kho; Anne E. Kho; Roger
B. Clark; Barbara G. Clark,
Defendants-Appellees.
 No. 91-2542.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 5, 1992
Decided: May 6, 1992
 
 Argued: Thomas Calvin Taylor, Bethea, Jordan & Griffin, P.A., Hilton Head Island, South Carolina, for Appellants.
 Matthew Holmes Henrikson, Barnwell, Whaley, Patterson & Helms, Charleston, South Carolina, for Appellees.
 Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.
 ERVIN, Chief Judge:
 
 
 1
 While vacationing at Hilton Head Island, South Carolina, Phyllis and Lee Goodman were injured when they walked off a ten-foot-high seawall and fell to the beach below. They brought suit against a homeowners' association and individual homeowners under the district court's diversity jurisdiction. A jury found that the defendants were not liable for the Goodmans' injuries. On appeal, the Goodmans challenge the defendants' use of peremptory challenges, three evidentiary rulings, and the district court's refusal to give certain requested jury instructions. We affirm.
 
 I.
 
 2
 The facts surrounding the Goodmans' accident are not in dispute. In January 1989, the Goodmans vacationed at their friends' condominium on Hilton Head. The condominium was located in the Bluff Villas development in the Sea Pines Plantation resort. Before dinner on their first full day there, the Goodmans bought and drank part of a six pack of beer. At dinner, Lee Goodman had two glasses of wine while Phyllis had one and a half glasses. After dinner, the Goodmans changed clothes back at the condominium and then walked in search of the beach. It was after dark, although there was a full moon. The Goodmans started down the private road that passed the Bluff Villas. They entered Lands End, an aptly named private development within Sea Pines, not seeing two wooden, unlit signs that read "Private Property No Thru Street" and "Private Residents Only." The Goodmans then came to a cul-de-sac. What appeared to them to be a walkway was actually the lawn between two houses. They walked between the two houses and then thought they saw a white pipe or some object in front of them. Without pausing, they continued to walk toward the ocean. Unfortunately, a seawall was there, and the Goodmans walked off of it. The Goodmans fell ten feet, with Phyllis landing partly on Lee. Lee broke his clavicle, wrist, ankle, and some ribs, and his broken ribs punctured one of his lungs. Lee's medical bills totalled approximately $20,000, and he missed four months' work. Phyllis had less serious injuries, with no broken bones and a faster recovery. The Goodmans brought suit under the district court's diversity jurisdiction against the owners of the two houses they had walked between and the Lands End Homeowners Association (hereinafter, collectively, Lands End).
 
 
 3
 During voir dire, Lands End used all three of its peremptory challenges to dismiss black men from the jury. The district court asked Lands End's counsel for race-neutral reasons for the challenges. Lands End's counsel stated that one of the men had the lowest level of education among the prospective jurors and had been napping during the proceedings, and that another had been between fifteen and twenty minutes late for the proceedings. The counsel then explained that the third venireman would not be a good juror for the defense because he was very effeminate. The district court found that these reasons were "sufficient," although the court was not sure that the reason for excusing the third juror was "justifiable." The district court also noted that he would have upheld Lands End's peremptory challenges "even absent any articulation" of racially neutral reasons.
 
 
 4
 At trial, the district court excluded testimony from the Goodmans' expert witness, Dr. John Fruin. Dr. Fruin planned to testify that the Southern Building Code, which Hilton Head had adopted in 1988, required that a railing should have been placed on the seawall the Goodmans walked off. The district court also excluded three exhibits relating to the Code. Another witness for the Goodmans, Tom Norby, was expected to testify as to the number of visitors to Sea Pines in 1987 and 1988. Instead, the Goodmans' counsel asked him about the ownership of common areas. Lands End objected that the question went beyond the scope of Norby's expected testimony, and the district court sustained the objection, preventing Norby from testifying about the ownership of the common areas.
 
 
 5
 At the close of the trial, the district court rejected six jury instructions the Goodmans offered. Four of the instructions related to invitee status. The district court charged the jury about the duty of care owed to licensees and trespassers, but refused to give instructions about invitees. The district court also rejected two instructions about the effect of maintaining property so that it appears to be a common area.
 
 
 6
 The jury found that the homeowners association and the individual homeowners were not liable for the Goodmans' injuries. Because the jury did not answer special interrogatories, it is impossible to know on what ground or grounds the jury based its decision.
 
 II.
 
 7
 The Goodmans argue first that Lands End's peremptory challenges violated the third excluded juror's right to equal protection and denied the Goodmans a fair and impartial jury composed of a representative selection of South Carolina citizens. In support, the Goodmans cite Edmonson v. Leesville Concrete Co., 111 S. Ct. 2077 (1991), which extended Batson v. Kentucky, 476 U.S. 79 (1986), to civil trials. In Edmonson, the Supreme Court held that the equal protection component of the Fifth Amendment's due process clause prohibits a private litigant from basing peremptory challenges on race. In addition, the Court held that an opposing litigant has third-party standing to raise the excluded jurors' rights in the opposing litigant's own behalf. The Court further held that once a prima facie case of racial discrimination has been established, the party seeking to exercise its peremptory challenges must offer race-neutral explanations for them. Initially, the Goodmans challenge the district court's statement that race-neutral reasons were not required in a civil case:
 
 
 8
 I don't think until some appellate court extends[Batson ] to a civil case such as this, that I would be willing to be so aggressive as to extend it, so even absent any articulation [of race-neutral reasons], I still would deny your motion.
 
 
 9
 J.A. at 38 (emphasis added). Although Edmonson has since extended Batson to civil cases, the district court asked Lands End for race neutral reasons and found them sufficient. Therefore, the only question before us is whether the district court's decision that Lands End's race-neutral reasons were sufficient should be reversed.[1]
 
 
 10
 This court has held that a district court's decision on whether there has been a race-neutral explanation for the use of peremptory challenges is a finding of fact that should not be overturned unless it is clearly erroneous. United States v. Mitchell, 877 F.2d 294, 303 (4th Cir. 1989). The Goodmans argue that Lands End's reason for striking the third juror, that he was effeminate, was pretextual. The Goodmans place particular weight on the district court's use of the word "justifiable." In full, the district court stated:
 
 
 11
 I can't find anything wrong with the reasons that he articulates. I have always felt in the selection of juries that the level of education that a particular juror has is of some consideration and in particular to the defendant. I think that you will find, though I have never read it, and it may be a wives' tale, but most lawyers will tell you that the more responsible, more educated the juror, the more conservative the juror is likely to be. And so as a rule of thumb, defendants would just rather select a jury-a juror that has some education and has some judgment and has some experience in our free enterprise system of government, because they appreciate values a little bit more the story goes and are more conservative, more responsible jurors.
 
 
 12
 I think that would give support to this reason for striking [the first two black men], plus the fact that[the second one] was late.
 
 
 13
 [As to the third peremptory challenge], I don't know that I can say that his reason is one that is justifiable. But if that's the way he feels about jurors, I can't say that he can't strike one because he doesn't like the way that juror appears from a masculine vs. feminine standpoint. So I think that the reasons he's articulated are sufficient to justify his striking in the manner that he did.
 
 
 14
 J.A. at 36-37 (emphasis added). Read in context, the remarks show that the district court found that Lands End had given race-neutral reasons for exercising the three challenges. At most, the district court did not agree with the decision to strike the third juror. The district court certainly did not decide that Lands End's reason for striking that juror was pretextual or that it was not race-neutral. After reviewing the record for clear error, we hold that the district court's finding that Lands End had given sufficient race-neutral reasons for its peremptory challenges was not clearly erroneous.
 
 
 15
 The Goodmans next challenge the exclusion of certain evidence. Of course, the decision to admit evidence rests within the sound discretion of the district court and will not be reversed absent abuse of that discretion. Wilhelm v. Blue Bell, Inc., 773 F.2d 1429, 1436 (4th Cir. 1985), cert. denied, 475 U.S. 1016 (1986). Dr. Fruin, the Goodmans' expert witness, was prepared to testify that the seawall in question should have had a guardrail on it, which would have prevented the accident. The district court excluded Dr. Fruin's testimony. The problem with Dr. Fruin's proffered testimony is that it was based entirely on a selective reading of the Southern Building Code. Dr. Fruin misused the Code in two ways. First, by its terms the Code applied only to structures built after the Code had been adopted. Because the seawall was built in 1981, before Hilton Head adopted the Code in 1988, the Code did not apply to the seawall. Second, Dr. Fruin relied on a section in the Code entitled "Guardrails" that could not apply to the seawall in question. The guardrails section was found in a chapter entitled "Means of Egress." Dr. Fruin admitted that this seawall was not a means of egress and that he found the guardrails section simply by looking for the word "guardrails" in the Code's index. He did not attempt to determine whether the section applied to the seawall in question. As Lands End argues, admitting Dr. Fruin's testimony could have misled the jury. Thus, because the guardrails section and the Code itself did not apply to the seawall, the district court's exclusion of Dr. Fruin's testimony was not an abuse of[6] discretion.[2] Similarly, we hold that the district court's decision to exclude three exhibits relating to the Code was not an abuse of discretion.
 
 
 16
 Next, the Goodmans argue that the district court erred in excluding certain testimony of another of their witnesses, Tom Norby. In answer to both court-ordered and defendant-requested interrogatories, the Goodmans stated: "Mr. Norby's testimony will relate to the issue of the number of tourists in the Sea Pines Plantation Resort area during the 1987 and 1988 time frame." At trial, the Goodmans' counsel instead asked Norby about the ownership of the roads, bike paths, beach accesses, and lagoons through out Sea Pines Plantation. Lands End objected that the questioning exceeded the scope of the discovery response, and the district court agreed, precluding the testimony. The Goodmans claim that questions about the ownership of property were within the "broad gambit of all questions relating to" Norby's expected testimony. However, questions about "the ownership of property" are quite distinct from ones regarding"the number of tourists." Furthermore, the Goodmans failed to protect the record as to what Norby would have answered, which makes it impossible for this court to determine whether the exclusion prejudiced the Goodmans. We therefore find no abuse of discretion in the district court's ruling.
 
 
 17
 Finally, the Goodmans argue that the district court erred in not giving six requested jury charges. Four of the charges related to invitee status. The district court instructed the jury about trespassers and licensees, but failed to give any charge related to invitees. The leading South Carolina case defining invitees is Parker v. Stevenson Oil Co., 140 S.E.2d 177 (S.C. 1965). In Parker, the South Carolina Supreme Court stated:
 
 
 18
 The term invitee is usually employed in premises liability cases as meaning the same thing as business visitor. As the term implies, this is the status of one who enters upon the premises of another at the express or implied invitation of the occupant, especially when he is upon a matter of mutual interest or advantage.
 
 
 19
 Id. at 179. Here, the Goodmans were not business visitors to Lands End, and their walking through Lands End was not of any interest or advantage to the homeowners. The homeowners certainly did not expressly invite the Goodmans onto their property, and we cannot say that the homeowners impliedly invited them, especially in light of the private property signs at the entrance to Lands End. Therefore, the Goodmans did not fit the Parker definition of invitee. While in some jurisdictions and areas of the law the old common law status distinctions have blurred, see, e.g., Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 630-32 (1959) (holding shipowner in admiralty owes duty to exercise reasonable care to all who are on board for purposes not inimical to his legitimate interests), South Carolina courts continue to apply the Parker invitee definition. See Crocker v. Barr, 409 S.E.2d 368, 371-72 (S.C. 1991). Therefore, the district court committed no error in failing to instruct the jury on invitees.
 
 
 20
 The Goodmans' fifth requested charge at issue stated:
 
 
 21
 Where the owner of land maintains some part of his land adjacent to a public way in such a condition as to have the appearance of being part of the public way, the owner may not then contend that the entrant on his land was a trespasser. He is an invitee.
 
 
 22
 There is no evidence that the seawall was adjacent to a public way or appeared to be part of the public way. There is also no South Carolina authority for this charge.
 
 
 23
 The Goodmans' sixth jury charge at issue stated:
 
 
 24
 If a person is injured after intruding by mistake on the Defendant's premises, and the Defendant has contributed to such mistake by maintaining the property in such manner as to mislead the intruder into assuming that he might rightfully use it, the owner or occupier is under the same duty of care toward him as though the misleading representation were true.
 
 
 25
 Again, there is no South Carolina law supporting this charge, for South Carolina does not distinguish between adults who intentionally trespass and those who trespass by mistake. There is also no evidence that the owners of the two lots in question (the Khos and the Clarks) maintained their property so as to mislead intruders. While there were steps to go down to the beach behind the two lots, the steps can only be reached from private decks. In addition, there is no evidence that the Goodmans saw the steps, or much of anything, during their fateful stroll. The Khos and the Clarks testified that they knew of five to ten trespassers in the past who had come onto the lots during the daytime. On all occasions, the owners told the trespassers that the lots were private property. There also was no testimony that they knew of any previous trespassers who came onto their property at night. We hold that the district court correctly declined to give this charge, because it is without legal or factual basis.
 
 
 26
 For the reasons stated above, the judgment of the district court is hereby
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 We will assume that the Goodmans have established a prima facie case of race-based peremptory challenges. Five of the eighteen potential jurors were black, three of which were male. Lands End used its three peremptory challenges to exclude all three black males
 
 
 [2]
 Dr. Fruin also stated that, without the Code, one would analyze local standards at the time the seawall was built to determine if it should have had a guardrail. He admitted that he had not done such an analysis